UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SANOFI-AVENTIS U.S. LLC,

       Plaintiff,

   v.

DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,

       Defendants.

Civil Action No. 24-1603 (DLF)

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**<u>CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

I.     Plaintiff's Motion is Moot for the Two Sample Contracts ....................................................1

II.    The Court Should Not Grant the Relief Plaintiff Requests. Instead, Plaintiff
       Should Be Precluded from More Piecemeal Litigation and Ordered to Narrow Its
       Request..............................................................................................................................2

III.   Plaintiff's Arguments About Exemption 4 Are Premature....................................................3

IV.    Exemption 4 Applies to the Information Plaintiff Seeks. .....................................................6

       A.    Commercial.............................................................................................................7

       B.    Confidential............................................................................................................8

       C.    Foreseeable Harm .................................................................................................10

V.     The Requested Records are Not in the Public Domain.......................................................11

# TABLE OF AUTHORITIES

## CASES

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) ..................................................................................... 5

*Baker & Hostetler LLP v. Dep't of Com.*,
473 F.3d 312 (D.C. Cir. 2006) ................................................................................ 8, 12

*Bayala v. Dep't of Homeland Sec.*,
827 F.3d 31 (D.C. Cir. 2016) ...................................................................................... 1

*COMPTEL v. FCC*,
910 F. Supp. 2d 100 (D.D.C. 2012) ............................................................................ 8

*CREW v. Dep't of Just.*,
58 F.4th 1255 (D.C. Cir. 2023) ................................................................................... 7

*CREW v. Dep't of Just.*,
Civ. A. No. 19-3626 (DLF), 2024 WL 1406550 (D.D.C. Mar. 31, 2024) ................ 7, 8

*EPIC v. Dep't of Homeland Sec.*,
117 F. Supp. 3d 46 (D.D.C. 2015) .......................................................................... 9, 12

*Keeping Gov't Beholden, Inc. v. Dep't of Just.*,
Civ. A. No. 17-1569 (FYP), 2021 WL 5918627 (D.D.C. Dec. 13, 2021) .................... 3

*Leopold v. Dep't of Just.*,
Civ. A. No. 19-3192 (RC), 2021 WL 124489 (D.D.C. Jan. 13, 2021) ........................ 11

*Payne Enters., Inc. v. United States*,
837 F.2d 486 (D.C. Cir. 1988) ................................................................................. 1, 5

*People for the Am. Way v. Dep't of Just.*,
451 F. Supp. 2d 6 (D.D.C. 2006) ................................................................................ 3

*Reps. Comm. for Freedom of the Press v. FBI*,
3 F.4th 350 (D.C. Cir. 2021) ...................................................................................... 1

*Wilson v. FCC*,
Civ. A. No. 21-0895 (RMM), 2022 WL 4245485 (D.D.C. Sept. 15, 2022) ................. 9

*Wolf v. CIA*,
569 F. Supp. 2d 1 (D.D.C. 2008) ................................................................................ 3

Defendants the Department of Health and Human Services (the "Department") and the Health Resources and Services Administration ("HRSA" or the "Administration"), through undersigned counsel, respectfully submit this reply in support of their motion for partial summary judgment under Federal Rule of Civil Procedure ("Rule") 56.

## I.    <u>Plaintiff's Motion is Moot for the Two Sample Contracts</u>

When an agency releases the records at issue, the issue is moot under the Freedom of Information Act ("FOIA") as to those records. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 367 (D.C. Cir. 2021) ("The government released the full and unredacted version of th[e] letter during the pendency of this appeal. So this issue is moot."); *Bayala v. Dep't of Homeland Sec.*, 827 F.3d 31, 34 (D.C. Cir. 2016) ("[W]here the government has released . . . a portion of the requested documents, the case is moot . . . with regard to those documents.").

Plaintiff has made it clear throughout its brief that the information it seeks is narrow. Plaintiff "seeks anonymized contract terms between covered entities and third-party contract pharmacies that reflect (1) whether contract pharmacies act as agents of covered entities, and (2) whether covered entities maintain title over 340B-priced drugs shipped to contract pharmacies." Pl. Mot. at 6, 9, 10.

On Monday, November 25, 2024, Defendants released section 3.3.5 of the Walgreens contract unredacted after engaging in the submitter process. It reads:

> 3.3.5.    Covered Entity will hold title to replacement 340B Drugs from the time Supplier fills an order from Walgreens made on behalf of Covered Entity until the time that Walgreens takes delivery of such drugs at the applicable Pharmacy Location, at which time title shall pass to Walgreens.

*See* Walgreens Contract § 3.3.5, ECF Nos. 23-2, 24-2 at 6.  For the Pole Mountain contract, and now the Walgreens contract, the issue is moot. *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988) ("A declaration that an agency's initial refusal to disclose requested

information was unlawful, after the agency made that information available, would constitute an advisory opinion in contravention of Article III of the Constitution.").

## II.     The Court Should Not Grant the Relief Plaintiff Requests. Instead, Plaintiff Should Be Precluded from More Piecemeal Litigation and Ordered to Narrow Its Request

As explained in Defendants' cross motion and declaration, Defendants would not be able to comply with the arbitrary demands that Plaintiff seeks from this Court. Defendants estimate that there are as many of 7,500 contracts consisting of between 75,000 and 195,000 pages. *Id.* ¶¶ 35, 39. Defendants do not have any additional resources to dedicate to this FOIA litigation. *Id.* ¶ 42. And to satisfy the full scope of the request, Defendants estimate that it would take approximately thirteen and a half work years to complete. *Id.* ¶ 43.

Plaintiff offers no meaningful response to Defendants' arguments. Instead, Plaintiff states that "agencies should not be allowed to hide behind a FOIA backlog" and "generally, lack of resources is not an excuse for failing to comply with FOIA." Pl.'s Reply at 15, ECF Nos. 23, 24. Plaintiff continues, "[t]he government could have proposed an alternative timeline that, in its view, might better accommodate its limited resources and the nature of [Plaintiff's] request," which, as will be explained in more detail below, completely ignores that Defendants have repeatedly expressed their interest in meeting and conferring with Plaintiff about its request, but it has been Plaintiff, not Defendants, who refuse. Pl's Reply at 15; May Decl. ¶¶ 33-34.

Defendants have repeatedly represented to Plaintiff that they are willing and interested in working with it to fulfill its request despite its overbreadth. May Decl. ¶ 33 ("While the FOIA office is willing to work with Plaintiff to produce the requested records, the scale and timeframe suggested by Plaintiff is unattainable."); *id.* ¶ 34 ("If Plaintiff were willing to narrow their request, it would greatly help both parties process and receive the contracts in a timely manner.").

Indeed, on Monday, November 25, 2024—in the middle of briefing and before re-releasing the Walgreens contract after engaging in the submitter process—Defendants asked Plaintiff if it would be amenable to meet and confer. Defendants explained to Plaintiff that they hoped to come to an agreement about a reasonable number of contracts and a realistic time frame for producing them. Defendants further stated that a meet and confer would be more productive for all parties— and the Court—than the path that the parties are currently on. Plaintiff refused.

The Court should deny Plaintiff's demands for relief in full as they are arbitrary and impossible to comply with. Further, if Plaintiff is truly unwilling to narrow its request or even meet and confer with Defendants about it, then Defendants will have no choice but to move for summary judgment because, as is, Plaintiff's request is unreasonably burdensome to process. *Cf. Keeping Gov't Beholden, Inc. v. Dep't of Just.*, Civ. A. No. 17-1569 (FYP), 2021 WL 5918627, at *3, 7 (D.D.C. Dec. 13, 2021) (finding it unduly burdensome to process a request that would take approximately 1,059,990 minutes (or 17,666 hours) of searching); *Wolf v. CIA*, 569 F. Supp. 2d 1, 9 (D.D.C. 2008) (finding a search of microfilm that would take an estimated 3,675 hours and cost $147,000 to be unreasonably burdensome); *People for the Am. Way v. Dep't of Just.*, 451 F. Supp. 2d 6, 13 (D.D.C. 2006) (finding a search unreasonably burdensome where the agency provided an affidavit explaining that compliance would require the agency to devote 25,000 hours to manually searching all 44,000 files encompassed in the request).

## III.    <u>Plaintiff's Arguments About Exemption 4 Are Premature</u>

Before addressing Plaintiff's arguments about how Exemption 4 may or may not apply to the information it seeks, it bears re-mentioning the posture of this case. Currently, Defendants have searched for, processed, and produced two contracts after engaging in the submitter process. May Decl. ¶¶ 18-20, ECF No. 20-2; Walgreens Contract, ECF Nos. 23-2, 24-2; Pole Mountain Contract, ECF Nos. 23-3; 24-3. Defendants processed these two contracts because Plaintiff agreed to receive

and review them before deciding whether it wanted Defendants to process any others. May Decl.
¶¶ 12-13; *see also* Emails, ECF No. 18-6. When Plaintiff moved for summary judgment, that was
the first time that Defendants learned that Plaintiff wanted Defendants to search for and process
all contracts. Therefore, to date, no other contracts have been processed except for the two.

Thus, Plaintiff's arguments about how Exemption 4 may or may not apply is currently a
theoretical inquiry based on presumptions and future events that may or may not occur. For
example, it may be that after engaging in the submitter process with more third parties, they all
agree to release the information Plaintiff seeks. That is certainly a possibility, given that Walgreens
agreed to release the information Plaintiff seeks, despite Plaintiff's conviction that neither
Defendants nor either of the pharmacies would. *Compare* Jt. Status Rep., ECF No. 17 ("There is
no indication that [the Administration] intends to change its position by releasing the pharmacy
contracts. Nor is there any indication that the submitter of the pharmacy contracts will consent to
their release given the ongoing dispute about [Plaintiff's] contract-pharmacy restrictions."), *with*
Walgreens Contract ¶ 4, ECF No. 20-3 ("Although Walgreen Co. asserted in the September 4th
Response that all of Section 3, including 3.3.5, should not be disclosed as it satisfies Exemption 4
to FOIA, Walgreen Co. is willing to permit disclosure of Section 3.3.5 given that its purpose is
primarily to document a 340B program requirement for contract pharmacy 'ship to bill to'
arrangements.").

The Pole Mountain contract was released in full after Defendants did not receive a response
from it after engaging in the submitter process. May Decl. ¶ 19, ECF No. 20-2 ("The contract was
released in its entirety after [the Administration] submitted a [pre-disclosure notice] to Pole
Mountain but received no response."). If future contracts are similarly released, Plaintiff would be
seeking an opinion and order from the Court to use its scarce resources deciding an issue that may

never materialize. *Payne*, 837 F.2d at 491 ("A declaration that an agency's initial refusal to disclose requested information was unlawful, after the agency made that information available, would constitute an advisory opinion in contravention of Article III of the Constitution.").

By way of further example, it may be that some of the contracts do not contain provisions that Plaintiff assumes exists. For example, Plaintiff has made it abundantly clear that it is interested in only two items of information: (1) whether contract pharmacies act as agents of covered entities, and (2) whether covered entities maintain title over 340B-priced drugs shipped to contract pharmacies." Pl. Mot. at 6, 9, 10. But the Pole Mountain contract that was produced does not contain any provision about title. *See* Pole Mountain Contract, ECF Nos. 23-3, 34-3. Instead, it contains a provision about ownership, which is related to title, but is not necessarily the same. *See* Pole Mountain Contract § 4.2.2; *see also* 73 C.J.S. Property § 50 ("In normal legal usage, title signifies ownership of the thing in question. Thus, it has been said that ownership is an essential incident of title. However, it has also been recognized that 'legal title' to property by itself does not necessarily confer a right of ownership."). It may be that other contracts do not include terms about title or agency relationships at all.

Therefore, while Plaintiff argues that granting its motion "would provide valuable guidance and help the parties avoid future litigation," Pl.'s Reply at 14-15, ultimately, this could all be for nothing. While not directly applicable to the circumstances, the concept of prudential ripeness is persuasive under the circumstances. As the D.C. Circuit explained in *American Petroleum Institute v. EPA*, 683 F.3d 382, 386-87 (D.C. Cir. 2012):

> In the context of agency decision making, letting the administrative process run its course before binding parties to a judicial decision prevents courts from "entangling themselves in abstract disagreements over administrative policies, and ... protect[s] the agencies from judicial interference" in an ongoing decision-making process. Postponing review can also conserve judicial resources, and it "comports with our theoretical role as the governmental branch of last resort."

> For instance, declining jurisdiction over a dispute while there is still time for the challenging party to "convince the agency to alter a tentative position" provides the agency "an opportunity to correct its own mistakes and to apply its expertise," potentially eliminating the need for (and costs of) judicial review. Even if the challenger fails to persuade the agency, permitting the administrative process to reach its end can at least solidify or simplify the factual context and narrow the legal issues at play, allowing for more intelligent resolution of any remaining claims and avoiding inefficient and unnecessary "piecemeal review." Put simply, the doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once.

*Id.* (citations omitted). The D.C. Circuit continued:

> Courts decline to review "tentative" agency positions because doing so "severely compromises the interests" the ripeness doctrine protects: "The agency is denied full opportunity to apply its expertise and to correct errors or modify positions in the course of a proceeding, the integrity of the administrative process is threatened by piecemeal review of the substantive underpinnings of a rule, and judicial economy is disserved because judicial review might prove unnecessary if persons seeking such review are able to convince the agency to alter a tentative position."

*Id.* at 387 (citation omitted).

These same principles apply here. While this case may be "ripe" in the sense that Plaintiff has submitted a FOIA request but has not obtained all of the documents that it requested, Plaintiff is asking the Court to issue an opinion and order regarding an issue that either may become moot for other future documents or does not apply to other future documents because they do not contain the provisions Plaintiff assumes they contain. At this juncture, therefore, the "guidance" that Plaintiff seeks from the Court is nothing but a theoretical exercise that may never materialize.

## IV.    **Exemption 4 Applies to the Information Plaintiff Seeks.**

If the Court chooses to consider Plaintiff's arguments, then the information Plaintiff seeks is properly exempt under Exemption 4. Plaintiff tries to distract the Court from this finding by arguing that Defendants' cross motion "digresses into why the nonresponsive portions of the pharmacy contracts are protected by Exemption 4," Pl.'s Reply at 9, but that misconstrues

Defendants' cross motion. The arguments for why the rest of the contracts were withheld also apply to the specific information Plaintiff requests as well.

> ### A.    Commercial

First, the information Plaintiff seeks is commercial. At issue are terms in a contract relating to the sale and exchange of drugs under the 340B program. As explained in Defendants' cross motion, by definition, this is commercial information. *See* Commercial, Black's Law Dictionary (12th ed. 2024) ("Of, relating to, or involving the selling of goods or services for profit."); *see also Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Just.*, 58 F.4th 1255, 1263 (D.C. Cir. 2023) ("And, in ordinary parlance, information is commercial if it pertains to the exchange of goods or services or the making of a profit.").

In fact, "this Court has already recognized, information that addresses a business contract of a company is commercial." *CREW v. Dep't of Just.*, Civ. A. No. 19-3626 (DLF), 2024 WL 1406550, at *4 (D.D.C. Mar. 31, 2024) (cleaned up). "After all, business organizations plainly have a commercial interest in their contracts and matters affecting such contracts." *Id.*

Plaintiff's reply simply repeats the same arguments from its motion, i.e., the information it seeks is really legal, not commercial, which is why Walgreens agreed to release it. *See* Pl.'s Reply at 9-10. But again, regardless of whether the information Plaintiff seeks is also legal or can also be categorized another way, it is commercial.

By way of analogy, Uber and Lyft are ride-hailing services that have built businesses based on the fact that their drivers are not employees but are instead independent contractors. The agency relationship, or lack thereof, that Uber and Lyft have with their drivers is a central component of their business models. It has even been the subject of several lawsuits. Regardless of whether categorizing their drivers as employees or independent contractors would commercially harm them, at its core, the decision to categorize a person as an employee or an independent contractor

at all is a business decision, which also makes it commercial. *CREW*, 2024 WL 1406550, at *5 ("[D]isclosure of the contractors' names would reveal an ongoing 'business purpose'—the contractors' commercial activity in a specific market."); *see also* Commercial, Black's Law Dictionary (12th ed. 2024) ("[r]esulting from business activities"). Similarly, the agency relationship, or lack thereof, between covered entities and pharmacies under the 340B program reflects the business decisions, models, and agreements of the parties involved in the contracts. Thus, they are commercial.

The same can be said for the concept of title to goods. Both who has title to property and when it is obtained are terms that can be bargained for. Plaintiff's position that the concept of title is not commercial, by way of another analogy, is akin to saying who has title in the sale of a car is not commercial, or when title passes from one to another in the sale of a car is not commercial. But who has title to goods or when it passes from one to another in a transaction is, indeed, the central component of any commercial transaction, just as much as things like price and other deliverables.

While the information sought must be commercial in and of itself, the concept "reaches more broadly" than what Plaintiff argues. *Baker & Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006); *see also COMPTEL v. FCC*, 910 F. Supp. 2d 100, 115 (D.D.C. 2012) ("The terms 'commercial' or 'financial' in Exemption 4 . . . are construed broadly."). The information requested here is commercial.

### B.    Confidential

Second, the information Plaintiff seeks is likely confidential. It depends on whether the third parties reveal that they customarily and actually keep the requested information confidential after Defendants have engaged in the submitter process with them, which, as explained above, Defendants have not done yet because until this briefing, Plaintiff indicated that it was willing to

accept only the two contracts produced. May Decl. ¶¶ 12-13; *see also* Emails, ECF No. 18-6. Plaintiff cites to a few contracts that it found on the Internet and argues that finding those contracts suggests an industry-wide practice of not keeping contracts confidential, *see* Pl.'s Reply at 11, but that is an erroneous extrapolation based on the few contracts it purports to have found. The parties cannot know what an entire industry does based on a few contracts that somehow made their way onto the Internet. *Cf. Wilson v. FCC*, Civ. A. No. 21-0895 (RMM), 2022 WL 4245485, at *11 (D.D.C. Sept. 15, 2022) ("The agency's decision to release other information in a past case based on its assessment of the public and private interests at stake there does not create a 'clear implication' that the agency would release information in this and all future cases involving roughly similar public interests.").

In this case, both contracts that were produced contain confidentiality provisions, which are "useful to the Court in evaluating whether intent existed to shield the information from the public." *EPIC v. Dep't of Homeland Sec.*, 117 F. Supp. 3d 46, 64 (D.D.C. 2015) ("In considering the parties' confidentiality agreements, [among other things], the Court concludes that the [records] would not ordinarily be released to the public and are confidential."); *see* Walgreens Contract § 8.3, ECF Nos. 23-2, 24-2; Pole Mountain Contract § 14, ECF Nos. 23-3, 24-3. That Walgreens agreed to release one of the provisions of its contract that it originally withheld to avoid a dispute is not indicative of what an entire industry would do, or what Walgreens would do in the future. And even though it is not necessary, it bears mentioning that by engaging in the submitter process, Defendants are providing third parties with an assurance of confidentiality if they request it and can support it, an argument that Plaintiff unsurprisingly abandoned in its reply brief. *See Wilson*, 2022 WL 4245485, at *10 ("But the agency's regulations are enough to show that the

[agency] advertised that confidentiality was available to [the submitter] if [the submitter] followed appropriate procedures, and [the submitter] followed the procedures.").

### C.    Foreseeable Harm

Third, the information Plaintiff seeks would cause foreseeable harm. Plaintiff largely misconstrues the arguments in Defendants' cross motion, creating a distinction between whether Defendants voluntarily or involuntarily obtained the records at issue, but the distinction misses the mark. Pl.'s Reply at 12-13. Plaintiff also argues because Walgreens eventually agreed to release a provision Plaintiff was interested in, neither Walgreens, the Administration, nor any other covered entity or pharmacy would foresee harm in releasing the provisions in the other contracts that Plaintiff requested. *Id.* This is not so.

While it may be that Defendants obtained the contracts Plaintiff seeks through audits, that does not diminish the harm in disclosing the provisions of the contracts Plaintiff is interested in. By participating in the 340B program, both drug manufacturers and covered entities agree to audits. 42 U.S.C. § 256b(a)(5)(C) (covered entities); § 256b(d)(1)(B)(v) (drug manufacturers). Thus, when one occurs, the manufacturer or covered entity is not compelled to involuntarily produce documentation, as Plaintiff suggests. Pl.'s Reply at 12-13. Instead, it is a condition they voluntarily accept as being a part of the program. In exchange, it allows covered entities to use their savings from the discounted drugs to preserve and expand access to care for the patients and communities they serve. What the manufacturers and covered entities do not agree to, however, is that the documentation from the audits will be collected and released to the public through FOIA requests.

If a pharmacy's contract with a covered entity containing the provisions that Plaintiff is interested in, as well as others, is produced to the public through FOIA requests despite both parties' intent to keep it confidential, notwithstanding that there was an audit, then that would

discourage pharmacies from participating in the 340B program. If pharmacies are discouraged from participating in the program, then it would hurt the program because it would make it more difficult for patients to obtain their needed drugs at a discount or cost free.

*Leopold v. Department of Justice*, Civ. A. No. 19-3192 (RC), 2021 WL 124489 (D.D.C. Jan. 13, 2021), a case cited in Defendants' cross motion but ignored by Plaintiff, is persuasive on the issue. There, the plaintiff sought a report prepared by an independent monitor evaluating a bank's anti-money laundering and sanctions compliance policies. *Id.* at *1. The report was created by the monitor after the bank agreed to a deferred prosecution agreement and a corporate monitor agreement after it was charged with, among other things, failing to maintain an effective anti-money laundering program. *Id.* Ultimately, the Court agreed that the entire report was exempt under Exemption 4 because, among other things, "public release of the confidential information would dissuade [the bank] and others from cooperating with the government in the future." *Id.* at *7.

Here, Defendants have a similar interest in obtaining cooperation from drug manufacturers, covered entities, and pharmacies to make sure the 340B program fulfills its purpose. If Defendants audit a manufacturer or a covered entity, the purpose is to ensure compliance with the program. Defendants do not want to discourage pharmacies from participating in the program in the same way that the government did not want to discourage the bank from cooperating with the government in *Leopold*, regardless of how they obtained the records at issue.

## V.      The Requested Records are Not in the Public Domain

"Under [the] public-domain doctrine, materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999). "Prior disclosure of similar information does not suffice; instead, the specific information sought by the plaintiff must already be in the public

11

domain by official disclosure." *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007). As such, "a plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Id.* (citation omitted).

Plaintiff's argument regarding the public domain doctrine is erroneous. Plaintiff has not shown that the specific provisions of the contracts it requests are in the public domain. If they were, Plaintiff would not have submitted a FOIA request. *EPIC*, 117 F. Supp. 3d at 65 (remarking if the identities of defense contracting companies were public, then it was "not clear why [the plaintiff] was still seeking the information").

## CONCLUSION

For the reasons above, as well as in Defendants' cross motion, the Court should deny Plaintiff's motion for summary judgment, deny Lilly's motion to file a brief as amicus curiae, and grant Defendants' cross motion for partial summary judgment.

Date:   December 6, 2024

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:     */s/ Sam Escher*
SAM ESCHER, D.C. Bar #1655538
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2531
Sam.Escher@usdoj.gov

*Attorneys for United States of America*